IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **8:05CR17** |
| **vs.** ) | |
| ) | **REPORT AND** |
| **JOSE MARTIN NAVA-RAMIREZ,** ) | **RECOMMENDATION** |
| ) | |
| **Defendant.** ) | |

This matter is before the court on the defendant Jose Martin Nava-Ramirez's MOTION TO SUPPRESS [#8]. Hearing on the motion was held April 12, 2005. The transcript of the proceeding [#16] was filed April 22, 2005, at which time the matter was deemed submitted.

During the April 12, 2005 hearing, the defendant amended his motion to suppress to include only two allegations: (1) the January 18, 2005 stop of a vehicle operated by the defendant occurred without reasonable suspicion or probable cause (4:11-21); and (2), any statements made by the defendant were not voluntarily, intelligently, and knowingly given because the defendant does not speak English and could not understand the gravity of what was going on. The defendant alleges the stop violated his right under the Fourth Amendment and his statements were made in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution.

For the reasons discussed herein, I recommend that the motion be denied.

## FACTUAL BACKGROUND

Donato Sikorski testified that he is a special agent with the Drug Enforcement Administration, currently assigned to Omaha, Nebraska. On January 18, 2005 he was involved in an investigation of Javier Rodriguez-Lara and a surveillance at 5241 South 21st Street. While conducting the surveillance, he learned that a deal was set up to deliver methamphetamine (29:12-18) near Joe Tess' Restaurant at 24th and "S" Street (29:22-30:10).

Sikorski testified that he observed a blue and green Jeep Cherokee driven by an Hispanic male pull up to the residence at 5241 South 21st Street. The driver did not exit the vehicle; however, another subject came from the house and entered the passenger side and the vehicle left the area. Sikorski stayed in the area and radioed other officers both the description and plate number of the vehicle (30:11-19). Sikorski was made aware by radio message that the vehicle had arrived at Joe Tess' and dropped off the passenger (30:1-10).

Sikorski was also informed that the passenger had been arrested on a federal warrant (30:20-31:3) and that the Jeep had left Joe Tess'. He was instructed that if the Jeep returned to the house it should be detained to ascertain what role the driver played in the drug deal (30:20-31:3).

Sikorski testified that it was approximately 2:06 p.m. when he first observed the Jeep at the residence and 2:12 when it returned (31:12-17). When the Jeep returned, it pulled into an alleyway and parked next to the side door of the house. Sikorski pulled his vehicle behind it and he along with other officers removed the defendant from the vehicle (31:18-25). The

defendant was placed in handcuffs and taken to the front of the vehicle (32:6-14). Sikorski noted that he did not converse with the defendant as the defendant is Spanish-speaking and Sikorski is not fluent in Spanish (32:15-19). After other officers arrived, Sikorski and Robert Johnson transported the defendant to the Omaha office of the DEA (33:1-2).

Sikorski testified that while he did not participate in the initial interview with the defendant at the DEA office, he and special agent Tony Smith of Immigration and Customs did, at a later time, conduct a brief interview with the defendant (33:13-24) and that interview led to the defendant signing a consent to search form (Ex. 1) to search 5815 "Q" Street, Apartment B. The form, written in both English and in Spanish, was signed by the defendant and witnessed by special agent Henry Anton (34:2-17). Sikorski testified that in securing the consent he made no promises or threats, the defendant did not appear to be under the influence of drugs or alcohol and was generally cooperative (34:19-35:6).

On cross-examination Sikorski testified that while he was involved in the surveillance of Rodriguez, he was not the case agent (35:15-18). He admitted knowing there was a federal warrant for Rodriguez (35:19-21). He noted that prior to the events on January 18, 2005 he had heard the defendant's name mentioned in the investigation of 5815 "Q" Street and that he had noted those references in a report written on January 20, 2005 (36:8-37:3). The report also mentioned methamphetamine and a Hector Gutierrez, who had pointed out 5815 "Q" Street "as an address that was possibly hiding methamphetamine." Sikorski noted

law enforcement had conducted other interviews in which the defendant's name was mentioned in association with 5815 "Q" Street (37:4-13).

Sikorski testified on cross-examination that he first observed the defendant's Jeep at approximately 2:06 and that he had set up the surveillance at about 1:30 (38:14-24). Sikorski estimated the distance between the residence and Joe Tess' restaurant at three or four blocks (40:25-41:2). He noted that when the defendant was removed from the vehicle, it was stationary (42:21-43:6), the defendant was the only occupant, and that the officers had their weapons drawn. Sikorski grabbed the defendant by the hand, removed him from the vehicle, handcuffed him, and took him into custody (43:8-13). Sikorski believed there were three officers present and all with guns drawn and that once the defendant's identity was determined, he was transported to the Omaha office of the DEA (46:17-23).

Sikorski testified that he had a conversation with the defendant at the DEA office after he confirmed with the landlord at 5815 "Q" Street that the defendant was a tenant in the downstairs area. Sikorski contacted the defendant along with special agent Tony Smith, who speaks Spanish, and during the interview, the defendant admitted living at 5815 "Q" Street. When asked if there were any drugs or guns or weapons at the address, the defendant stated "no." Sikorski then requested a consent to search the address and the defendant said he would consent and signed a consent form (48:2-11).

Henry Anton testified he is a special agent for the Department of Homeland Security, Immigration, and Customs Enforcement, having been so employed since 1988. On

January 18, 2005 he was involved in a buy-bust involving Javier Rodriguez-Lara (7:24-8:5). He describes a buy-bust as the purchase of a controlled substance followed by an immediate arrest (8:12-15). While conducting surveillance, he observed Rodriguez exit the passenger side of a vehicle near Joe Tess' restaurant. He watched as Rodriguez delivered two ounces of methamphetamine to a third party (9:10-14), as the vehicle which he identified as a black Jeep left the area (9:15-25). Anton observed the arrest of Rodriguez and the seizure of approximately two ounces of methamphetamine (9:10-14).

Anton testified that later that day he and special agent Tyler Cruz contacted the defendant at the DEA office and Cruz advised the defendant of his rights, in Spanish, Anton's native tongue (10:13-11:9). Anton stated that during the interview he made no promises or threats and that the defendant spoke with him for ten to fifteen minutes (11:24-12:10), during which he told Anton he had obtained approximately two ounces of methamphetamine for Rodriguez, had gone to Rodriguez's home to give him the drugs, had given Rodriguez a ride to Joe Tess', dropped him off, and returned to Rodriguez's residence (12:11-17). Following the interview, Anton read the defendant a consent form to 5815 "Q" Street, Apt. B, Omaha, Nebraska (Ex. 1), and the defendant signed the form (12:18-13:4).

On cross-examination Anton testified he did not know the details leading to the Rodriguez warrant and did not know if the investigation was geared towards Rodriguez; however, he was aware of the federal warrant (14:20-15:10).

Anton further testified on cross-examination that during the surveillance at Joe Tess' restaurant, he was located across the street to the east with Tyler Cruz and special agent Frank Feden in an unmarked car, wearing civilian clothes (17:11-18:3). He testified that at about 3:00 or 4:00 in the afternoon he observed a black Jeep pull into the area and drop Rodriguez off. While he observed both the driver and Rodriguez, he could not say whether or not the defendant was the driver (18:5-19:7). After the drop-off, which took only a matter of seconds, the black Jeep left the area while he remained at the restaurant and observed Rodriguez being taken into custody (20:11-21). On redirect examination Anton testified that when the Jeep arrived at Joe Tess' he confirmed the license plate number as the number earlier given to him (27:18-21). However, he could not make a positive identification the individual he observed at 2:06 was the same individual he saw at 2:12 (51:6-10).

On cross-examination Anton testified that he is fluent in Spanish (22:10-16). During his interview with the defendant both he and agent Cruz would have asked questions; however, he would have repeated Cruz's questions to the defendant in Spanish (25:18-25). Anton stated that his involvement in the case was limited to surveillance at Joe Tess' and a brief interview with the defendant at the DEA office (27:7-10).

## LEGAL ANALYSIS

### A.   The Vehicle Stop

The record shows that the defendant's vehicle was not stopped for a traffic violation. Although there was no traffic violation, "[p]olice officers may make warrantless arrests when

-6-

they have probable cause to believe a person has committed a felony." *United States v. Travis*, 993 F.2d 1316, 1323 (8th Cir.), *cert. denied*, 510 U.S. 889 (1993) (citing *United States v. Watson*, 423 U.S. 411 (1976)). "Probable cause exists when officers possess information that would 'warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "In making this determination, the court may consider the collective knowledge of all officers involved." *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993).

Here, while the defendant's name was familiar to the police officers, he was arrested only after his passenger, Rodriguez-Lara, was arrested for delivering methamphetamine. I find that the officers had probable cause to believe the defendant was also culpable in the delivery of the methamphetamine seized during the "buy-bust" at Joe Tess' Restaurant. Hence, his arrest did not violate the Fourth Amendment.

**B.     Statements**

Defendant's arguments that his statements were obtained in violation of his Fifth and Sixth Amendment rights are not discussed in any detail in his brief. He appears to argue only that he did not understand English; therefore, his statements and consent to search were involuntarily made because he did not understand the gravity of his encounter with the officers.

The record shows, however, that the police officers communicated with the defendant in Spanish, or through Spanish language interpreters, i.e., Agents Anton, Cruz or Smith. The evidence was uncontroverted that defendant was given his *Miranda* rights in Spanish by

-7-

Agent Anton and agreed to talk to the officers. (11:15-12:7; 22:20-23:17). Defendant did not ask for an attorney. (26:1-3). The consent to search form signed by the defendant is written in both English and Spanish. Agent Anton read the form to the defendant in Spanish. Defendant had no questions and signed the form. There is no evidence showing that the defendant's will was overborne, or that he was coerced, deceived, or promised anything in return for his signing the form and speaking to the officers. *See United States v. Syslo*, 303 F.3d 860, 865-66 (8th Cir. 2002) (To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne.).

## RECOMMENDATION

Because I find that the defendant's arrest was based on probable cause and the defendant's statements were voluntarily, intelligently, and knowingly given,

**IT IS RECOMMENDED** that the MOTION TO SUPPRESS [#8] be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED May 23, 2005.**

> **BY THE COURT:**
>
> **s/ F.A. Gossett**
> **United States Magistrate Judge**